UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TOWN OF STRATFORD,<br><br>           Plaintiff,<br>v.<br><br>CITY OF BRIDGEPORT,<br><br>           Defendant. | 3:10-cv-394 (CSH) |

**RULING ON MOTION TO REMAND AND**
**MOTION FOR PRELIMINARY INJUNCTION**

HAIGHT, Senior District Judge:

Plaintiff Town of Stratford ("Stratford") commenced this action in Connecticut Superior Court, Judicial District of Fairfield, on March 9, 2010, and sought a preliminary injunction. On March 16, 2010, Defendant City of Bridgeport ("Bridgeport") removed the case to federal court. On March 19, 2010, Plaintiff filed a motion to remand. For the reasons stated herein, Plaintiff's Motion to Remand to State Court [Doc. 12] is DENIED, and Plaintiff's Motion for a Preliminary Injunction [Doc. 6] is DENIED.

**I.     BACKGROUND**

Defendant City of Bridgeport is the owner of Sikorsky Memorial Airport ("Airport"), which is located in the neighboring Town of Stratford. Adjacent to the Airport is approximately 78 acres of property owned by the United States and commonly referred to as the Stratford Army Engine Plant ("SAEP"). The United States contracted to sell the SAEP to a third party, Point Stratford Development, LLC, f/k/a Hollywood East/Area 51, LLC ("Hollywood East"). As a result of various issues concerning the anticipated sale, two related lawsuits were commenced which came before this Court: *City of Bridgeport v. United States of America Dep't of the Army*,

Docket No. 3:09-cv-532 (CSH) and *Bridgeport Airport Services, Inc. v. City of Bridgeport, et al.*, Docket No. 3:09-cv-555 (CSH).  The first was resolved on October 5, 2009, when the plaintiff in that case, City of Bridgeport, filed a Notice of Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  The second of the companion cases was resolved on March 5, 2010, when the Court approved a Settlement Agreement, which had been reached after extensive negotiations, ably supervised by Magistrate Judge Joan G. Margolis.  Pursuant to the Settlement Agreement, 1.075 acre of the SAEP has been removed from the tract to be sold to Hollywood East, and is to be transferred instead from the United States to the City of Bridgeport for use in connection with the development of a federally-mandated runway safety area ("RSA") at the Airport.  The Army has already transferred the one acre to the Federal Aviation Administration ("FAA"), but the FAA has not yet transferred the acre to the City of Bridgeport.

The creation of the runway safety area at the Airport is necessary because of several airplane accidents, some fatal, which have occurred at the Airport and which have been made worse than they might otherwise have been by the current configuration of the Airport, where there is not an adequate runway safety area.  Pursuant to the terms of the Settlement Agreement, "the City agrees to utilize the 1.075 acre parcel for an airport runway safety area and runway protection zone together with the associated roadway and utilities to be relocated thereon *and not for airport runway expansion*."  (Tripartite Settlement Agreement at ¶ 2.2) [3:09cv555, Doc. 70 at 37] (emphasis added).  Thus, the Settlement Agreement specifically prohibits the use of the additional acre for expanding the runway, meaning the available space for planes to take off and land in non-emergency situations.  In approving the Settlement Agreement, the Court stated that it was "satisfied that the Settlement Agreement is fair and reasonable to all parties, and furthers

the public interest in respect of safety in the air and [is] an appropriate disposition of surplus Army real property." [3:09cv555, Doc. 71 at 3] The Court "retain[ed] jurisdiction over the captioned case for purposes of enforcing the terms of the Settlement Agreement, and any other issues that may arise requiring further litigation." *Id*. Because the Settlement Agreement is referenced in Plaintiff's Complaint at ¶¶ 9-10, and because it is a matter of public record of which this court has direct knowledge and may take judicial notice, it is appropriate to consider it in resolving the pending motions.

Four days after the Settlement Agreement was approved, Plaintiff Stratford filed in state court a two count complaint for breach of contract and declaratory judgment. Upon its removal to federal court, the instant case was transferred to me because its subject matter relates to the two cases described above. Plaintiff's claim is that, pursuant to both Conn. Gen. Stat. § 13b-43 and a 1978 agreement between Stratford and Bridgeport, which is attached to the complaint as Exhibit A (the "1978 Agreement"), Defendant is required to obtain approval from Plaintiff before it can extend Airport runways, or acquire land for the purpose of doing so, and that Defendant has failed to obtain the requisite permission from Plaintiff.

Plaintiff seeks a permanent injunction that Defendant "cease any acquisition [of] property for the expansion of the Airport runways, without first obtaining permission from the Plaintiff" and a permanent injunction that Defendant "cease[] any expansion of the Airport runways, without first obtaining permission from the Plaintiff." (Compl., Relief Sought Section, ¶¶ 1,2) Plaintiff also seeks declaratory judgment that "Defendant shall not act in acquiring property for the expansion of the Airport without first obtaining permission from the Plaintiff," that Defendant "shall not act in expanding the runways without [] first obtaining permission from the

3

Plaintiff," and that Plaintiff "is entitled to pursue action to enforce rights it may have with respect to collection of property taxes from Defendant," citing ¶ 13 of the 1978 Agreement. (Compl., Relief Sought Section, ¶¶ 3-5. See also Compl. ¶ 27)

## II.   MOTION TO REMAND

Defendant removed the case to federal court on the basis that "[t]he relief requested by the plaintiff would necessarily require the defendant to violate direct orders from the Federal Aviation Administration, which orders relate directly to airport safety." (Notice of Removal, ¶ 4) Defendant asserted that "[t]he United States District Court has original jurisdiction over the Plaintiff's constitutional and federal law based claims pursuant to 49 U.S.C. § 14501(c) and 49 U.S.C. 41713(b), as well as any pendent state law claims pursuant to 28 U.S.C. § 1367, and the Plaintiff's Complaint is removable to the United States District Court pursuant to the provisions of 28 U.S.C. §§ 1441(a), 1441(b) and 1443(2). Any non-removable state causes of action alleged by the Plaintiff, having been joined with their claims under federal law, are removable to the District Court pursuant to 28 U.S.C. § 1441(c)." (Notice of Removal, ¶ 5)

Plaintiff moves to remand on the basis that this court lacks jurisdiction because the complaint asserts only state law claims. Normally, "the well-pleaded complaint rule . . . provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citations and internal quotation marks omitted). Furthermore, "the existence of a federal defense normally does not create statutory 'arising under' jurisdiction." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004), citing *Louisville &*

*Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908). *See* 28 U.S.C. § 1331 (Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States.")

However, there is an exception to the well-pleaded complaint rule, and Defendant relies on that exception in opposing remand. "When a federal statute wholly displaces the state-law cause of action through complete pre-emption, the state claim can be removed. This is so because when the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Davila*, 542 U.S. at 207-208, quoting *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003) (internal quotation marks omitted). "On occasion, the Court has concluded that the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule. Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393 (citations and internal quotation marks omitted).

Defendant maintains that removal was proper because Plaintiff's state law claims are completely pre-empted by the Federal Aviation Act of 1958 ("FAAct"), 49 U.S.C. § 40101, *et seq.*. Where, as here, the federal statute does not expressly provide that it pre-empts state law, implied preemption can nonetheless arise "when, in the absence of explicit statutory language, . . . Congress intended the Federal Government to occupy a field exclusively, or when state law actually conflicts with federal law." *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 220 (2d

Cir. 2008) (citations and internal quotation marks omitted).  Circuits that have considered the question have generally determined that the FAAct serves to fully occupy the field of aviation safety.  *See Montalvo v. Spirit Airlines*, 508 F.3d 464, 473-74 (9th Cir. 2007); *Greene v. B.F. Goodrich Avionics Systems, Inc.*, 409 F.3d 784, 794-95 (6th Cir. 2005); *Abdullah v. American Airlines*, 181 F.3d 363, 367-68 (3rd Cir. 1999); *French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir. 1989).

While neither the United States Supreme Court nor the Second Circuit have squarely addressed this question, the Second Circuit did recently indicate in dicta that the FAAct may impliedly preempt the field of airline safety.  *Air Transp. Ass'n of Am.*, 520 F.3d at 224.  The Court noted that "the FAA 'was passed by Congress for the purpose of centralizing in a single authority -- indeed, in one administrator -- the power to frame rules for the safe and efficient use of the nation's airspace.'" *Id.,* quoting *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960).  The Second Circuit explained that "Congress and the Federal Aviation Administration have used this authority to enact rules addressing virtually all areas of air safety," and that "this power extends to . . . airport runways."  *Id.* at 224-25 (citation omitted).

Courts in this district have also recently concluded that "the Federal Aviation Act evidences a clear congressional intent to occupy the entire field of aviation safety."  *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 681 F. Supp. 2d 182, 201 (D. Conn. 2010).  For example, in a case similar to this one, the Tweed-New Haven Airport Authority sought "to prevent the East Haven defendants from continuing to use their local municipal powers to obstruct construction of a federally-mandated, federally-funded, and state- and federally-approved, aviation safety and air navigation project," specifically a Runway Safety

6

Area.  *Tweed-New Haven Airport Auth. v. Town of East Haven*, 582 F. Supp. 2d 261, 263 (D. Conn. 2008).  Judge Hall found that "RSAs are a vital component of airport safety, because they enhance the safety of air travelers by providing an area for aircraft which undershoot, overrun, or veer off the runway," *Id.* at 264 (citation omitted), and held that "the FAAct impliedly preempts the East Haven defendants' regulations because Congress intended to regulate, *i.e.*, to fully occupy, the field of airline safety within which field the Runway Project lies.  *Id.* at 267.

Notably, Plaintiff Stratford "does not dispute the FAAct's preemption of the field in regulation of airspace of the United States (49 U.S.C. § 40103(a)(1)), which includes the airspace needed to ensure safety in the takeoff and landing of the aircraft (*Id*. § 40102(a)(32))." (Pl.'s Reply at 2.)  However, like the East Haven defendants in *Tweed*, Stratford "view[s] the issue as one of land use regulation, not airport safety."  582 F. Supp. 2d at 270.  Plaintiff attempts to avoid the outcome in *Tweed* by emphasizing that the finding of federal preemption in that case was based partially upon the fact that the creation of the runway safety area would occur within existing airport property.  582 F. Supp. 2d at 270 ("Because the RSAs are being created for the purpose of meeting the FAA safety standards and the Runway Project is being done within Authority property, the court finds that the East Haven defendants' regulations, as applied to the Runway Project, are preempted by the FAAct.").  However, Judge Hall did not conclude that the runway safety project's taking place on existing airport property was a necessary condition for preemption, but merely held that the question need not be reached because the project in that instance was so located.  *Id.* ("[W]hile the court is not convinced that construction on land outside of airport property would necessarily fail a preemption challenge if it related to airport safety, it finds that, in this case, it need not answer that question because the record supports the

conclusion that the Runway Project will take place within pre-existing Airport boundaries.").

Plaintiff also relies heavily on *Dallas/Fort Worth Int'l Airport Bd. v. City of Irving* ("*Dallas*"), a 1993 Texas state Court of Appeals case that was subsequently vacated as moot due to changes to the challenged ordinance.  854 S.W.2d 161 (Tex. App. 5th Dist. 1993), vacated by *Dallas/Fort Worth Int'l Airport Bd. v. City of Irving*, 868 S.W.2d 750 (Tex. 1994).  In *Dallas*, the Board of Dallas/Fort Worth International Airport announced its intention to conduct a major expansion of the airport, including the construction of two new runways, 854 S.W.2d at 164, which would require the acquisition of 772 homes near the airport, as well as various streets. *Id.* at 168, fn. 5. In response, the cities in which the airport is located amended their comprehensive zoning ordinances "to insure that all structures and land uses that might result in large environmental impacts, including but not limited to airports, are consistent with each city's comprehensive zoning plan." *Id.* at 164.  In focusing on the *Dallas* court's holding that "Congress does not expressly or impliedly preempt local land-use regulation," *Id.* at 169, Stratford neglects the previous sentence, which reads, "We find the FAA regulations preempt local laws, but only in the specific areas set out by Congress.  These areas include safety, airspace, and noise control." *Id.*  The *Dallas* court further stated, "There is no dispute that local law is preempted where safety is the main issue," *Id.* at 168, noting that "the main reason for expansion in this case is to increase air-traffic capacity." *Id.* at 168, fn. 7.  Thus, *Dallas* may be read to suggest that if aviation safety had been at issue, then the FAAct would have had preemptive effect, even where, as there, the airport was seeking to expand beyond its current boundaries.

8

*Preemption Analysis*

Plaintiff claims that Defendant is required to obtain approval from Plaintiff before it can extend Airport runways, or acquire land for the purpose of doing so, and that Defendant has failed to obtain permission from Plaintiff. In support of this claim, Plaintiff relies on Paragraph 10 of the 1978 Agreement between Stratford and Bridgeport, and on Conn. Gen. Stat. § 13b-43.

Paragraph 10 of the 1978 Agreement states in full:

> In consideration for the above, the City of Bridgeport hereby recognizes and acknowledges that it has the obligation under existing federal and state case law and statutes of receiving permission from the Town of Stratford for the acquisition of land for the purposes of extension of the airport runways, and permission from the Town of Stratford for the extension of any of the airport runways.

Conn. Gen. Stat. §13b-43, captioned "Municipal airports," states in its entirety:

> Any municipality, or any two or more municipalities jointly, may establish, maintain and operate an airport at any location within the state approved by the commissioner and by the municipality or municipalities within which such airport is to be established, and may take any land or interest therein necessary for such establishment at such location upon paying just compensation to the owner of such land or interest therein. The approval of the municipality shall be by vote of a town or borough and by vote of the city council of a city. <u>Any municipality, or any two or more municipalities jointly, may expand or improve an airport, and may take any land or interest therein necessary for such expansion or improvement when, in the opinion of the commissioner, public convenience or safety requires, and when the approval of the municipality or municipalities in which such land is located has been legally obtained, upon paying just compensation to the owner of such land or interest therein</u>. In case such municipality or municipalities cannot agree with such owner upon the amount of such compensation, the amount shall be determined in the manner prescribed in section 48-12. An appeal from the amount so determined shall not act as a stay of the taking of such land, provided no facility or land or interest therein held by a public service company for service to the public shall be so taken or removed unless, at the expense of the

> party seeking such taking or removal, an adequate and equal substitute approved by the Department of Public Utility Control shall first be provided.

Conn. Gen. Stat. § 13b-43 (emphasis added). Clearly, the primary focus of this statute is takings. In the instant case, the federal government, in the form of the FAA, already owns the 1.075 acre that it has agreed to transfer to Bridgeport for the creation of the federally-mandated runway safety area at the Airport. The question is whether Conn. Gen. Stat. § 13b-43 requires Bridgeport to obtain Stratford's approval, as Stratford maintains, even when there is no taking involved because the federal government already owns the subject property. The Court concludes that it does not, or if it does, that it is pre-empted.

As the Connecticut Supreme Court has said, "General Statutes § 13b-43 sets out detailed procedures that a municipality must follow *in order to take property* for the establishment, maintenance, expansion, or improvement of its airport. For example, the municipality must provide just compensation to the owner of the property; in cases where the land to be acquired lies outside the boundaries of the municipality which owns the airport, the town in which the land is located must also *approve the taking*." *Ulichny v. City of Bridgeport*, 230 Conn. 140, 144 fn. 6 (1994) (emphasis added). The Connecticut Supreme Court characterized § 13b-43 as setting out "detailed statutory taking procedures and safeguards" for exercising the "power of eminent domain . . . to ensure the safe and efficient operation of an airport." *Id*. at 146, citing *Powers v. Ulichny*, 185 Conn. 145, 150-51 (1981) (internal quotation marks and citations omitted).

In *Powers v. Ulichny*, 185 Conn. 145 (1981), Plaintiff Commissioner of Transportation Powers sought a permanent injunction preventing Defendant restaurant owner Ulichny of

Stratford from adding a second story to his restaurant, because it would pose a hazard to planes taking off and landing at Sikorsky Airport in Bridgeport. The Connecticut Supreme Court stated, "Under § 13b-43, Bridgeport must obtain the approval of the town of Stratford, and pay the defendant just compensation for the interest taken. It has not done so. Sections 15-73 and 13b-43 provide a vehicle for a municipality to acquire interests in airport hazards to ensure the safe and efficient operation of an airport." 185 Conn. at 150-151.

Thus, it appears that an important legislative purpose of Conn. Gen. Stat. § 13b-43 was to advance public safety by establishing procedures for the taking of property in instances where doing so is necessary for airport safety. Stratford now invokes this statute to prevent Bridgeport, absent Stratford's permission, from receiving the 1.075 acre from the federal government that will enable the creation of a runway safety area at the Airport. Conn. Gen. Stat. § 13b-43 does attempt to balance local interests against the need for public safety at airports by requiring the approval of the municipality in which land to be taken is located. However, it appears from both the text of the statute and the case law interpreting it that the municipal approval requirement applies only in the context of takings, which are not at issue in the instant case.[1]

---

[1] *New Haven v. East Haven*, 35 Conn. Supp. 157 (Conn. Super. Ct. 1977), is also consistent with this reading. In that case, the Connecticut Superior Court explained that "Although New Haven was originally authorized to take property for airport purposes by eminent domain in East Haven as well as in New Haven; Special Acts 1929, No. 266; this was changed by the adoption of legislation which prohibits the acquisition of property either by condemnation or purchase without the consent of the town wherein the property lies. General Statutes § 13b-43." *Id.* at 161, fn. 8. This suggests that regardless of whether the property to be taken by eminent domain is purchased from the owner or requires resort to condemnation, the municipality where the property to be taken is located must first give its consent. Thus, pursuant to the statute, Stratford would have to give its consent for any taking, regardless of how it was accomplished, but because the 1.075 acre at issue is already owned by the government and no taking is necessary to effect its transfer, it does not appear that Stratford's approval is required by Conn. Gen. Stat. § 13b-43.

However, if Conn. Gen. Stat. § 13b-43 stands for what Stratford contends it does, namely that, absent Stratford's approval, the FAA may not transfer the 1.075 acre that it owns to Bridgeport to enable the creation of a Congressionally-mandated runway safety area at the Airport, then Conn. Gen. Stat. § 13b-43 is preempted by the FAAct because, as explained at length above, the FAAct impliedly preempts the field of aviation safety. By its title and terms, Conn. Gen. Stat. § 13b-43 expressly addresses when and how improvements necessary to aviation safety can be made at municipal airports. "Courts have long distinguished between state laws that directly affect aeronautical safety, on the one hand, and facially neutral laws of general application that have merely an incidental impact on aviation safety." *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 681 F. Supp. 2d 182, 201-02 (D. Conn. 2010). In *Goodspeed*, a small airport not regulated by the FAA wanted to remove certain trees that it believed posed a hazard to planes taking off and landing. However, because the trees were located in a wetland, generally applicable state and local environmental laws required that a permit be obtained before the trees could be removed or trimmed. The airport contended that it could remove the trees without seeking a permit because the field of aviation safety was federally pre-empted, but the court held that "in the particular circumstances of this case, federal regulation of airport safety does not preempt state and local environmental laws." *Goodspeed*, 681 F. Supp. 2d at 184. Unlike the environmental laws in *Goodspeed* that were subject to a safety-based challenge by an airport and found not to be federally pre-empted, Conn. Gen. Stat. § 13b-43 is not a facially neutral law of general application but rather one that directly addresses and affects aviation safety.

In *Goodspeed*, Judge Kravitz based his finding of no federal pre-emption not only on the

fact that the laws in question were facially neutral and generally applicable, rather than targeted to airport safety, but also on the fact that the airport in question in *Goodspeed*, in contrast to the Sikorsky Airport at issue here, did not provide regularly-scheduled passenger service, and was therefore licensed not by the FAA, but by the State of Connecticut. Thus, Judge Kravitz noted that *Tweed*, where federal pre-emption was found, was "easily distinguishable" from *Goodspeed* on the following basis:

> As an airport serving regularly-scheduled air carrier operations utilizing aircraft carrying more than nine passengers, the Tweed-New Haven Airport is required to hold an operating certificate issued by the FAA under Part 139. See 14 C.F.R. Part 139; see also 49 U.S.C. § 44706(a)(2). Under Part 139, Tweed-New Haven is under a clear obligation to have [runway safety areas] acceptable to the FAA. See 14 C.F.R. § 139.309(a).

*Goodspeed*, 681 F. Supp. 2d at 205-06. The Sikorsky Airport has regularly scheduled passenger traffic and is subject to the same federal licensing and regulations as was Tweed, where federal pre-emption was found, and has the same obligation to have runway safety areas.[2]

For the reasons stated herein, this court concludes that Conn. Gen. Stat. § 13b-43, to the extent it can be read, as Plaintiff suggests, to require an airport to obtain approval of the town in which it is located before it can undertake a federally-mandated runway safety project, even when no taking is required to do so,[3] is pre-empted by the FAAct, thus conveying federal jurisdiction over this dispute. Therefore, Plaintiff's Motion to Remand [Doc. 12] is denied.

---

[2] "[N]ot later than December 31, 2015, the owner or operator of an airport certificated under 49 U.S.C. § 44706 shall improve the airport's runway safety areas to comply with the Federal Aviation Administration design standards required by 14 CFR part 139." Pub.L. 109-115 (November 30, 2005), 119 Stat. 2401 (Note to 49 U.S.C. § 44706).

[3] Given the facts of this case, the court need not and does not address whether Conn. Gen. Stat. § 13b-43 would also be pre-empted by the FAAct were a municipality to withhold its consent for a taking necessary for aviation safety.

Finally, the Court notes, as did Defendant, that remand would be inefficient and a waste of judicial resources, because if the case were remanded, the FAA, as the owner of the 1.075 acre of property at issue, would seek to intervene, as it has done here. The FAA would most likely be granted intervention on the basis of their ownership of the subject property, at which point this case would again be removed to federal court and would unquestionably be properly before this court. [Doc. 25 at 11, fn. 2]

### III. MOTION FOR PRELIMINARY INJUNCTION

Also pending in this case are two motions initially filed by Plaintiff in state court, which were transferred to this court when the case was removed from state to federal court. They are a motion for a temporary injunction [Doc. 6], which is called a preliminary injunction in federal court, and a motion to waive bond for the issuance of an injunction [Doc. 7]. Plaintiff seeks a preliminary injunction directing "that the Defendant ceases any expansion of the Airport runways" and "that the Defendant ceases any acquisition of property for the expansion of the Airport runways." (PI Motion ¶ 23.)

In this circuit, in order to obtain a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, the movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). "[I]rreparable injury means injury for which a monetary award cannot be adequate compensation." *Id*.

Plaintiff identifies the following as the irreparable harm it stands to suffer absent an

injunction: "The Plaintiff will be irreparably harmed if Defendant continues with and executes plans for *expansion of the Airport runways*," and "Plaintiff will be irreparably harmed if the transaction closes and the Defendant is able to acquire the property for the *expansion of the runway* at the Airport without the explicit consent and approval of the Plaintiff."  (PI Motion at ¶¶ 19-20) (emphasis added).

However, the asserted irreparable harm, namely the expansion of the runways, is expressly forbidden pursuant to the terms of the Settlement Agreement governing the transfer of the 1.075 acre at issue.  As noted *supra*, the Settlement Agreement specifically provides that "the City [of Bridgeport] agrees to utilize the 1.075 acre parcel for an airport runway safety area and runway protection zone together with the associated roadway and utilities to be relocated thereon *and not for airport runway expansion*."  (Tripartite Settlement Agreement at ¶ 2.2) [3:09cv555, Doc. 70 at 37] (emphasis added).  Construction of a runway safety area is not a runway expansion because it does not expand the useable runway for planes to take off or land in a non-emergency situation.  Because the Settlement Agreement is referenced in Plaintiff's Complaint at ¶¶ 9-10 and in the preliminary injunction motion at ¶¶ 12 & 15, and in light of the fact that this Court approved the Settlement Agreement and "retain[ed] jurisdiction... for purposes of enforcing the terms of the Settlement Agreement, and any other issues that may arise requiring further litigation" [3:09cv555, Doc. 71 at 3], the Court may consider the Settlement Agreement in assessing Plaintiff's claim that it will suffer irreparable harm.  Based on the unambiguous terms of the Settlement Agreement, the 1.075 acre of land to be transferred may not be used for runway expansion, and therefore it is not reasonable to believe that the harm cited by Plaintiff in its preliminary injunction motion, namely runway expansion, will come to pass, let alone that

such harm would be irreparable in the sense that it could not be adequately compensated by money damages.

The preliminary injunction motion also states that the 1.075 acre "is to be used by Defendant to expand the Airport runways, and divert and relocate Route 113, also known as Main Street." (PI Motion at ¶ 13.) However, in identifying the irreparable harm it faces, Plaintiff does not cite the relocation of Route 113. (See PI Motion at ¶¶ 19-10.) Since Plaintiff does not rely on the road relocation as a potential source of irreparable harm, the court need not reach that issue, although there is no reason to suppose that road relocation would give rise to irreparable harm.

Assuming *arguendo* that Plaintiff could show irreparable harm, Plaintiff's motion for a preliminary injunction nonetheless fails because Plaintiff cannot satisfy either of the latter two prongs of the test: likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships favoring the party requesting the preliminary relief.

Plaintiff is not likely to succeed on the merits because, as discussed at length in the ruling on the motion to remand, the field of aviation safety is federally preempted. That not only conveys jurisdiction upon the federal court, leading to a denial of remand, but also means that state laws seeking to regulate the field of aviation safety are preempted by the FAAct. As explained *supra*, the Court is not convinced that the state statute upon which Plaintiff Stratford relies, Conn. Gen. Stat. § 13b-43, actually means what Stratford contends it does, namely that the FAA may not transfer the 1.075 acre that it owns to Bridgeport to enable the creation of a Congressionally-mandated runway safety area at the Sikorsky Airport unless it first obtains Stratford's approval. To the contrary, as discussed above, a careful reading of the relevant

16

portion of the statute,[4] as well as case law interpreting it, suggests that the requirement of obtaining permission applies only the context of takings, and thus the statute appears to be inapplicable here. However, to the extent that Conn. Gen. Stat. § 13b-43 does apply in the instant situation and requires Bridgeport to obtain permission from Stratford before the 1.075 acre can be transferred to Bridgeport by the government for the construction of a runway safety area, as Plaintiff suggests, then the state statute is invalid because it is federally pre-empted. For these reasons, Plaintiff is not likely to prevail on the merits with respect to its claim pursuant to Conn. Gen. Stat. § 13b-43.

Nor is Plaintiff likely to succeed on its contract claim. Paragraph 10 of the 1978 Agreement, upon which Plaintiff relies, states:

> In consideration for the above, the City of Bridgeport hereby recognizes and acknowledges that it has the obligation under existing federal and state case law and statutes of receiving permission from the Town of Stratford for the acquisition of land for the purposes of *extension of the airport runways*, and permission from the Town of Stratford for the *extension of any of the airport runways*.

(emphasis added). Assuming it is enforceable, the 1978 Agreement requires Bridgeport to seek Stratford's permission to extend the airport runways, or to obtain land for doing so. As discussed *supra*, no extension of the runways is planned or contemplated, nor would runway expansion be permitted under the Settlement Agreement. The 1978 Agreement does not address the construction of runway safety areas, nor does it require Bridgeport to obtain Stratford's

---

[4] "Any municipality, or any two or more municipalities jointly, may expand or improve an airport, and may take any land or interest therein necessary for such expansion or improvement when, in the opinion of the commissioner, public convenience or safety requires, and when the approval of the municipality or municipalities in which such land is located has been legally obtained, upon paying just compensation to the owner of such land or interest therein." Conn. Gen. Stat. § 13b-43.

permission for construction of runway safety areas, so the 1978 Agreement is inapplicable to the question of whether Bridgeport must obtain permission from Stratford before the 1.075 acre can be transferred to Bridgeport by the federal government for the construction of a runway safety area. Therefore, Plaintiff is not likely to prevail on the basis of the 1978 Agreement.

Nor does the balance of hardships tip in favor of Plaintiff. Any harm that Plaintiff will suffer is clearly outweighed by the strong public interest in having the runway safety area established at the Airport as soon as possible, to bring the Airport into compliance with federal regulations that require such runway safety areas, and so that the runway safety area will be in place should there be another accident.

For the reasons stated herein, Plaintiff's motion for a preliminary injunction [Doc. 6] and the accompanying motion to waive bond [Doc. 7] are hereby denied.

### IV.     MOTION TO INTERVENE BY USA

The United States has moved pursuant to Federal Rule of Civil Procedure 24(a) to intervene as of right in this action on the basis that the United States, through the FAA, currently owns the 1.075 acre parcel of property that is in dispute in this litigation. Consistent with the Court's Order of April 28, 2010 [Doc. 24], Plaintiff shall file any opposition to the Motion to Intervene by the United States of America [Doc. 19] on or before July 2, 2010, which is fourteen days from today.

### V.     CONCLUSION

For the reasons stated herein, Plaintiff's Motion to Remand to State Court [Doc. 12] is DENIED. Plaintiff's Motion for a Preliminary Injunction [Doc. 6] and Plaintiff's Motion for Suspension of Bond Requirement [Doc. 7] are DENIED. Plaintiff's opposition to the Motion to

Intervene is due on or before July 2, 2010.

    SO ORDERED.

    Dated: New Haven, Connecticut, June 18, 2010.

                                                    /s/ Charles S. Haight, Jr.
                                                    Charles S. Haight, Jr.
                                                    Senior United States District Judge